IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY ANN FAUST, | : | |
| Plaintiff | : | |
| v. | : | 3:CV-06-0672 |
| | : | (JUDGE VANASKIE) |
| SCRANTON PETRO, L.P., | : | |
| Defendant | : | |

MEMORANDUM

Pending in this employment discrimination lawsuit is Defendant Scranton Petro, L.P.'s

("Scranton Petro") Motion for Summary Judgment.  (Dkt. Entry 12.)  Plaintiff Mary Ann Faust

was employed by Scranton Petro, an operator of a travel plaza in Dupont, Pennsylvania, until

her termination in 2004.  Claiming her termination was due to her sex and age, Ms. Faust filed

a complaint in this Court asserting Scranton Petro violated Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; the Age Discrimination in Employment Act

of 1967 ("ADEA"), 29 U.S.C. §§ 621-634; and the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Stat. Ann. §§ 951-963.  (Dkt. Entry 1.)[1]  Scranton Petro denies Ms. Faust's

allegations and contends she was laid off pursuant to a reduction in force ("RIF").  For the

reasons that follow, Scranton Petro's motion will be denied.

---

[1]This Court has jurisdiction over the Title VII and ADEA claims pursuant to 28 U.S.C. §
1331 and 42 U.S.C. § 2000e-5(f)(3), and over the PHRA claims pursuant to 28 U.S.C. §
1367(a).

I. BACKGROUND

    A. Procedural Background

    On March 31, 2006, Ms. Faust filed a four-count complaint alleging Scranton Petro violated federal and state anti-discrimination laws.  (Dkt. Entry 1.)  In Count One, Ms. Faust alleged that Scranton Petro terminated her because of her sex, in violation of Title VII.  See 42 U.S.C. § 2000e-2(a)(1).  In Count Two, Ms. Faust alleged that Scranton Petro terminated her on account of her age – she was fifty-eight (58) years old on the date she was terminated – in violation of the ADEA.  See 29 U.S.C. § 623(a)(1).  Counts Three and Four, respectively, are parallel claims under the PHRA asserting unlawful sex and age discrimination.  See 43 Pa. Stat. Ann. § 955(a).  Ms. Faust prayed for, among other things, an award of back pay, compensatory damages, and liquidated damages; an order of reinstatement; and an injunction against future discriminatory conduct.

    On May 24, 2006, Scranton Petro answered the complaint and denied Ms. Faust's allegations.  (Dkt. Entry 4.)  After discovery, Scranton Petro filed a Motion for Summary Judgment.  (Dkt. Entry 12.) The motion has been fully briefed, (Dkt. Entries 13, 16, 18), and is now ripe for disposition.

    B. Factual Background

    Scranton Petro is a limited partnership owned by brothers Frederick and Michael Kirschner.  (F. Kirschner Aff., Ex. 1 in Supp. Mot. Summ. J., Dkt. Entry 15, ¶ 1.)  Frederick

Kirschner is Scranton Petro's managing partner, John Diab Sr. is its chief operating officer.  (F. Kirschner Dep. ("Kirschner Dep."), Feb. 20, 2007, Ex. 16 in Supp. Pl.'s Counter-Statement Material Facts ("Ex._-PCMF"), Dkt. Entry 17-18, at 9:14-15, 20-21.)

On or about February 16, 2002, Scranton Petro began operating a travel plaza complex, or truck stop, in Dupont, Pennsylvania, as franchisee of Petro Stopping Centers, LP.  (F. Kirschner Aff. ¶ 1; Faust Dep., Dec. 8, 2006, Ex.12-PCMF, Dkt. Entry 17-14, at 9:4-6.)  The Dupont complex consists of four divisions, or "profit centers": (1) a convenience store known as the "Travel Store"; (2) a restaurant called the "Iron Skillet"; (3) a fuel island; and (4) a service center, or lube bay.  (Hodges Dep., Jan. 8, 2007, Ex.15-PCMF, Dkt. Entry 17-17, at 26:1-3.) Each profit center has its own manager, who is supervised by the complex's general manager. (Id. at 26:4-6; Diab Dep., Feb. 20, 2007, Ex.14-PCMF, Dkt. Entry 17-16, at 16:14-16.)  The complex manager, in turn, reports to Mr. Diab.  (Diab Dep. 16:12-14.)  At all times relevant to this matter, Leonard A. Krappa managed the Dupont complex, and Fred L. Hodges managed the Travel Store.  (Def.'s Statement Material Facts ("DSMF"), Dkt. Entry 26, ¶¶ 14, 16.)

Scranton Petro retained certain managers and employees of the previous operator of the Dupont complex, including Ms. Faust.  Ms. Faust began working at the Dupont complex on May 12, 1997.  Starting as a cashier, she was promoted in or about September of 1997 to assistant manager of the midnight shift.  (Pl.'s Counterstatement of Material Facts ("PCMF"), Dkt. Entry 17, ¶ 5; Faust Dep. 8:10-18.)  She eventually moved from midnight shift to second

3

shift and then to day shift, a shift she worked regularly for approximately six to seven months following the February, 2002, change of control.  (Faust Dep. 14:21-15:14, 17-20.)  Thereafter until her termination in April or May, 2004, Ms. Faust's schedule, as with the other assistant managers, varied between all three shifts.  (Id. at 15:14-16, 21-24; id. at 19:12-18.)

As assistant manager, Ms. Faust supervised the cashiers, responded to customer complaints, prepared daily reports, oversaw the lottery machine, and prepared payroll.  (Id. at 13:11-18; id. at 23:6-10.)  When Scranton Petro took control of the Dupont complex, Ms. Faust performed more bookkeeping duties, as she was responsible for preparing daily bank deposits and completing additional reports.  (Id. at 12:15-21.)  Ms. Faust testified that her duties were no different from that of the other assistant managers, except they did not prepare payroll or oversee the lottery machine.  (Faust Dep. 22:13-18.)[2]

---

[2]With respect to payroll, Ms. Faust testified that, once a week, she would retrieve the employees' time cards, insert them into a computer, and then fax them to the Kirschner brothers' other travel plaza in Bordentown, New Jersey.  (Faust Dep. 22:19-23:1.)  If Ms. Faust was not working the day payroll was to be prepared, Mr. Hodges assumed this responsibility.  (Id. at 23:2-5.)  Ms. Faust surmised that she was the only assistant manager handling payroll because she was doing this as assistant manager for the previous operator of the Dupont complex.  (Id. at 24:3-7.)

With respect to the lottery machine, Ms. Faust stocked it with lottery tickets, emptied and counted the money in the machine, and deposited that money into the Kirschners' bank account.  (Id. at 23:6-10.)  This was done every other day or once every three days.  (Id. at 23:11-13.)  Ms. Faust explained that, because the lottery machine was confusing to operate and oversee, it was best for just one person to regularly maintain the machine.  (Id. at 23:21-25.)

Mr. Hodges became manager of the Travel Store several months after Scranton Petro began operating the Dupont complex.  At that time, Ms. Faust was the only assistant manager. The store was later reorganized, which entailed hiring additional assistant managers.  By January 1, 2004, the Travel Store employed three assistant managers.  In addition to Ms. Faust, there was Michael Schoen, hired September 1, 2003, and Matthew Lee, hired December 1, 2003.  (Census of Active & Inactive Employees ("Employee Census"), Ex.1-PCMF, Dkt. Entry 17-3, at 2; id. at 10.)  Both men were younger than Ms. Faust, born, respectively, in 1965 and 1967.  (DSMF ¶¶ 5, 9.)  Ms. Faust, however, was paid a higher salary than her colleagues, earning $1,250 every two weeks while Mr. Schoen received $1,200 and Mr. Lee $1,100.  (Id. ¶¶ 3, 7, 10.)

In or around February, 2004, Mr. Kirschner met with Mr. Diab to discuss the financial status of the Dupont complex.  After analyzing the financial data and consulting with Mr. Diab regarding the current business plan, Mr. Kirschner decided change was necessary and instructed Mr. Diab to devise a new strategy to reduce expenses and make the business profitable.  (Kirschner Dep. 11:2-14.)  Mr. Kirschner offered no specific proposals in this regard. Instead, he deferred to Mr. Diab's judgment and management skills to effectuate his instructions.  (Id. at 11:18-21, 12:12-16.)  He observed to Mr. Diab, however, that payroll comprised fifty percent of the company's expenditures.  (Id. at 12:21-23.)  "[T]he primary area

to make an impact, immediate impact is in payroll." (Id. at 12:23-25.)[3]

To execute Mr. Kirschner's instructions, Mr. Diab designed the RIF plan, which he viewed the best way to improve the bottom line. (Diab Dep. 53:9-24.)  Mr. Diab conceived this idea without consulting or obtaining approval from Mr. Kirschner.  (Kirschner Dep. 13:15-24.) The plan, which was implemented in April, 2004, and completed by August, 2004, called for eliminating "highest paid personnel," specifically two gentlemen from the Bordentown location who provided services at Dupont.  (Diab Dep. 54:3-55:20.)  Additionally, assistant managers with "shaky" performances were cut, certain open positions were never filled, and Mr. Krappa was demoted to restaurant manager, a position he held prior to his promotion to complex manager.  (Id. at 54:21-55:8.)  By August, Mr. Diab claimed, "we were significantly saving." (Id. at 55:9-10.)

In implementing this strategy, Mr. Diab spoke to the profit center managers (including Mr. Hodges) and the complex manager (Mr. Krappa) in February or March, 2004, instructing

---

[3]Ms. Faust points to testimony to show that management's attitude to reduce expenses was no different in 2004 than previous years.  In this regard, Mr. Hodges testified that keeping expenses low is a natural concern in any retail business.  (Hodges Dep. 51:1-3.)  He also testified that Scranton Petro's management placed greater emphasis on cost cutting as early as 2003.  (PCMF ¶ 35.)  He acknowledged, however, that this attitude pervaded until 2006 and that in 2004 management was "making a lot of budgetary cutbacks and reductions throughout . . . Scranton Petro . . . .  And they were reducing the payroll." (Hodges Dep. 70:2-4, 6.)  Mr. Krappa testified to discussions in 2004 with Mr. Diab relating to the need to reduce expenditures generally and actions proposed in connection therewith, but nothing changed from discussions held in previous years.  (PCMF ¶ 34.)  "Basically in any business," Mr. Krappa testified, "you're always trying to find a way to make more money."  (Krappa Dep. 48:3-5.)

them to reduce their respective payrolls.  (Id. at 56:21-57:1; id. at 61:17-18, 62:4-8.)  They were advised to consider employee salaries.  No specific instructions, though, were given as to the number of employees to eliminate or the dollar amount by which payroll must be reduced.  (Id. at 58:2-9.)

One of the employees Scranton Petro contends was selected for termination was Ms. Faust.  Mr. Diab recounted discussions he had with Messrs. Krappa and Hodges, allegedly in the context of the RIF.   The gentlemen approached Mr. Diab and expressed dissatisfaction with Ms. Faust's performance.  (PCMF ¶ 10.)  It is unclear what Messrs. Krappa and Hodges found unsatisfactory about Ms. Faust's performance.  Mr. Diab was told by them before this conversation that Ms. Faust was having "problems" with customers and other employees of the Travel Store, but he could not recall any details about these "problems."  (Diab Dep. 47:23-48:11.)  In any event, Mr. Diab responded to their complaints by stating "if we're not satisfied, then we should terminate her and move on."  (Id. at 49:9-10.)  The decision to terminate, however, was relegated to Messrs. Krappa and Hodges.  (PCMF ¶ 9.)  Presumably they decided to terminate Ms. Faust, although Mr. Diab did not explicitly testify as such.

Messrs. Hodges and Krappa offered conflicting accounts regarding the RIF and Ms. Faust's selection therefor.  According to Mr. Hodges, he attended a meeting with Mr. Diab, Mr. Krappa, and Ray Castor, a consultant from the Bordentown complex.  (Hodges Dep. 72:2-4.) The date of the meeting is unknown, although it appears to have occurred shortly before Ms.

7

Faust's termination.  Mr. Hodges learned that personnel cuts were to be made; that this was happening throughout the complex; and that an assistant manager from the Travel Store would be eliminated.  (Id. at 71:23-72:1; id. at 72:6-10; id. at 73:16-22.)  He testified that he never suggested that Ms. Faust or any other Travel Store employee be eliminated.  (Id. at 74:15-17, 21.)  On the contrary, he told Mr. Castor of his desire to retain his store's entire workforce because the Travel Store itself was profitable, but this plea was unavailing.  (Id. at 72:17-19, 72:25-73:2.)  By the end of that day, Mr. Hodges learned, via Mr. Castor, that Mr. Diab selected Ms. Faust for termination, "that we had to let [her] go as soon as possible."  (Id. at 71:4-5; id. at 74:10-14.)  No explanation was given to Mr. Hodges why Ms. Faust was selected, nor did he request one from Mr. Diab.  (Id. at 74:22-75:2.)  Indeed, Mr. Hodges denied even conferring with Mr. Diab in relation to Ms. Faust's termination.  (Id. at 83:21-23; id. at 110:2-5.)

Mr. Krappa testified that he was never told by Mr. Diab or anyone else about the RIF or the need to reduce payroll.  (PCMF ¶ 36.)  Furthermore, according to Mr. Krappa, the decision to terminate Ms. Faust was unrelated to a workforce reduction.  In this regard, Mr. Krappa related a meeting that transpired approximately seven to ten days before Ms. Faust's termination.  Mr. Diab visited the Dupont complex.  After he and Mr. Krappa finished a "walk-around" of the complex, they met Mr. Hodges and "had some idle discussion about the restaurant and travel store."  (Krappa Dep., Feb. 20, 2007, Ex.13-PCMF, Dkt. Entry 17-15, at 34:23-35:4.)  Mr. Diab asked Mr. Hodges how Ms. Faust "was holding up" and pressed him "to

get more out of her." (Id. at 35:4-5; id. at 40:4-5.)  Mr. Hodges answered that "because of her health and her age that, you know, she's not going to be able to do what you want her to do." (PCMF ¶ 15.)  Mr. Krappa testified to Mr. Diab's response: "[Mr. Diab] made an umpire's out sign with his thumb and said, [']shoot her.[']  And [Mr. Hodges] said, [']why?['] [Mr. Diab] said, [']get] [sic] rid of her.'" (Krappa Dep. 35:14-17; see also id. at 73:9-10.)

When Mr. Hodges departed, Mr. Krappa tried to dissuade Mr. Diab from terminating Ms. Faust, observing she had been at the Dupont complex for several years and was a good, honest worker.  (Id. at 42:10-15.)  Mr. Diab, however, rebuffed this appeal and rebuked Mr. Krappa for not being "hard enough [and willing] to look past an individual and make a tough decision." (Id. at 42:20-23.)  This was the last conversation Mr. Krappa had with Mr. Diab about Ms. Faust prior to her termination.   Mr. Krappa noted that nothing was mentioned during this discussion with Messrs. Diab and Hodges about Ms. Faust's productivity or her salary (i.e., that she was the highest paid assistant manager).  (Id. at 57:22-58:10.)

Seven to ten days later, Mr. Krappa was informed by Mr. Hodges that Mr. Diab ordered Ms. Faust's termination, and that he intended to terminate her the same day.  (Id. at 43:2-13.) Mr. Krappa disagreed with this decision.  (Id. at 44:5-6.)  Nevertheless, he insisted he be present for the meeting with Ms. Faust.  (Id. at 44:11-14.)

Ms. Faust was eventually terminated April 24 or May 1, 2004.[4]  Upon arriving for her

shift (second shift), she was summoned for a meeting with Messrs. Krappa and Hodges.

(Faust Dep. 41:7-8, 13-15; id. at 42:6-11.)  There, Mr. Krappa told her she was terminated.  (Id.

at 42:20-21; Krappa Dep. 45:15-17.)  Mr. Hodges explained that her termination was due to a

"budgetary reduction in labor."  (PCMF ¶ 21.)  He also stated that her termination was unrelated

to her performance.  (Krappa Dep. 54:17-21.)  Mr. Krappa said he was "committed" to re-hiring

Ms. Faust once Scranton Petro's financial status improved.  (PCMF ¶ 40.)

Scranton Petro documented the reason for Ms. Faust's termination in two records.  First,

a census of active and inactive employees compiled by the company lists Ms. Faust as an

inactive employee and indicates the reason for her termination as "[b]udgetary [r]easons."  (Id.

¶ 22.)  Second, an employee status report completed by Mr. Hodges notes "[b]udgetary control"

as the reason for her termination.  (Faust Employee Status Report, Ex.10-PCMF, Dkt. Entry 17-

12.)  That report indicates that Ms. Faust worked all shifts as assistant manager.  (Id.)

Additionally, the report – which was prepared June 28, 2004, two months after Ms. Faust's

termination – notes the effective date of Ms. Faust's termination was April 19, 2004.  (Faust

---

[4]There is a discrepancy as to the actual date.  A statement completed by Mr. Hodges
indicates the meeting with Ms. Faust occurred April 24, 2004.  (Hodges Statement, Ex.7-PCMF,
Dkt. Entry 17-9.)  Ms. Faust cites to this statement in her Counterstatement of Material Facts.
(See PCMF ¶ 1.)  At her deposition, however, she testified the meeting occurred May 1, 2004.
(Faust Dep. 40:21-25.)  She also cites to this testimony in her Counterstatement of Material
Facts.  (See PCMF ¶ 1.)

Employee Status Report.)  The employee census also designated April 19, 2004, as the

effective date of her termination.  (PCMF ¶ 2.)

     In addition to being designated the effective date of Ms. Faust's termination, April 19,

2004, was also the effective date of Michael May's hiring.  (PCMF ¶ 24.)  Mr. May was hired as

an assistant manager assigned to the Travel Store and paid a weekly salary of $600.  (DSMF ¶

11, 13.)  Scranton Petro contends he was hired to fill the position vacated by Mr. Schoen, who

voluntarily resigned on or about April 8, 2004.  (Kirschner Dep. 16:24-17:8; see also DSMF ¶

4.)  Mr. May was paid the same salary as Mr. Schoen, which annualized was $31,200.  This

was surprising because Mr. Hodges testified that budgetary cutbacks reduced starting salaries

for assistant managers to a range of $24,000 to $27,000, with the actual salary determined by

the employee's experience.  (Hodges Dep. 49:11-14, 50:2-6.)  The record does not reflect Mr.

May's experience, although he was trained by Ms. Faust before her termination.  (Faust Dep.

20:11-13, 22-24; id. at 21:3-6; id. at 24:8-13.)

     Ms. Faust suggested Mr. May was hired as her replacement, although Scranton Petro

denies this and contends Ms. Faust's position was eliminated.[5]  Mr. Kirschner testified that Mr.

---

[5]Mr. Krappa testified that after Ms. Faust's termination a few assistant managers were
hired at the Travel Store, although he offered no further details and Scranton Petro disputes
this testimony.  (Krappa Dep. 48:13-21.)  It is undisputed that Ms. Faust was never contacted
when there were openings for assistant manager.  Indeed, in a section on her employee status
report labeled "Would you rehire?," Mr. Hodges checked the box "no."  (Faust Employee Status
Report.)  Although this contradicted Mr. Krappa's previous statement to Ms. Faust, Mr. Hodges
(continued...)

May's hiring and Ms. Faust's firing were unrelated, and that the positions were different insofar as Ms. Faust worked the dayshift and performed bookkeeping duties.  (Kirschner Dep. 15:15-16; id. at 17:20-18:2.)[6]  In the end, Ms. Faust was the only Travel Store assistant manager affected by the RIF.[7]

Irrespective of Scranton Petro's reason for the termination, Ms. Faust believes she was terminated because of her sex and age.  She notes that Messrs. Lee and May, both younger than she, were retained.  She also points to age-based comments by Messrs. Diab and Hodges.  In addition to Mr. Hodges's remark to Mr. Diab and the latter's response, Mr. Hodges also remarked to Mr. Schoen that Ms. Faust was either "unable to get around as well as younger people or that she was not able to get around as well because of her age."  (Schoen Aff., Ex.8-PCMF, Dkt. Entry 17-10, ¶ 5.)  Mr. Schoen could not recall precisely when this

---

[5](...continued)
testified that it was "my decision once she was gone, she was gone."  (Hodges Dep. 91:14-15.)

[6]Mr. May's time with Scranton Petro was short-lived, but the reason for his departure is disputed.  On the one hand, the employee census indicated his employment was terminated June 21, 2004, for "[b]udgetary [r]easons."  (Employee Census 12.)  On the other hand, a June 21, 2004, employee status report reveals that Mr. May took an unpaid administrative leave of absence due to a medical injury.  (May Employee Status Report II, Ex.11-PCMF, Dkt. Entry 17-13.)  Mr. May was injured at the Pocono racetrack where he worked as a part-time security guard.  (Hodges Dep. 44:7-10.)  He was on medical leave for approximately six months during which he remained an active employee.  (Id. at 44:11-13.)  After being contacted by Mr. Hodges, Mr. May said he was not returning because he found a better position and was going to school.  (Id. at 44:19-21.)

[7]On May 1, 2004, Mr. Lee, a Travel Store assistant manager, received a $50 raise in his biweekly salary.  (PCMF ¶ 26.)

remark was made, but indicated it was no earlier than December, 2003, nor later than April 8, 2004, his last day of employment.  (Id. ¶ 4.)  Mr. Krappa testified that he had several conversations with Mr. Diab where Mr. Diab brought up Ms. Faust's age as an issue, although he provided no specific details about Mr. Diab's comments.  (Krappa Dep. 41:1-8.)

Following her termination, Ms. Faust obtained employment at another truck stop, Pilot, working as a deli coordinator/cashier.  (Faust Dep. 51:15-17.)  In her employment application, completed November 29, 2004, Ms. Faust listed "[c]ut [b]ack" as the reason for leaving Scranton Petro.  (Pilot Employment Application, Ex. 8 in Supp. Mot. Summ. J., Dkt. Entry 15.)

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to

the nonmoving party. Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 256-57. Mere conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### B. Age Discrimination Claims

The ADEA declares it unlawful "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1); see also 43 Pa. Stat. Ann. § 955(a) (similar prohibition). To succeed on a claim of age discrimination under the ADEA and PHRA, the plaintiff "must show that his or her age 'actually motivated' and 'had a determinative influence on' the employer's decision to fire him or her." Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000)).[8] A

---

[8]Our Court of Appeals has explained "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its

(continued...)

plaintiff sustains this burden by (1) adducing direct evidence of discrimination that satisfies the requirements of Justice O'Connor's opinion in Price Waterhouse v. Hopkins, 490 U.S. 228, 261-79 (1989) (O'Connor, J., concurring in judgment) ("mixed-motive theory"), or (2) offering indirect evidence of discrimination that satisfies the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ("pretext theory"). Id. at 337-38. The character of the evidence adduced by the plaintiff determines the analytical framework applicable to her claims. See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512 (3d Cir. 1997). Here, Ms. Faust contends she has presented both direct and indirect evidence of discrimination, and, thus, Scranton Petro's summary judgment motion should be denied.

Ms. Faust contends the evidence is sufficient to create a triable issue whether Scranton Petro's proffered justification for termination is pretextual, thereby defeating summary judgment. In age discrimination cases presented under the pretext theory, the Third Circuit applies a "slightly modified version" of the familiar McDonnell Douglas burden-shifting framework. Anderson v. Consol. Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Under this three-step approach, a plaintiff must first present sufficient evidence to

---

[8](...continued)
language requiring that it be treated differently." Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002). Because 43 Pa. Stat. Ann. § 955(a) contains no such language, the ADEA and PHRA provisions are interpreted identically and governed by the same legal standards. Id.

establish a prima facie case of discrimination.[9] Anderson, 297 F.3d at 249. If plaintiff is able to establish a prima facie case of discrimination, "[t]he burden of production (but not the burden of persuasion) shifts to the defendant." Keller, 130 F.3d at 1108. The defendant must then offer evidence that is sufficient to support a finding that it had a legitimate, non-discriminatory reason for the discharge. Id. If the defendant fails to do so, judgment must be entered for the plaintiff. If the defendant offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff. To survive summary judgment, the plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

Scranton Petro concedes Ms. Faust has presented a prima facie case. (Def.'s Br. Supp. Mot. Summ. J. ("Def.'s Br. Supp."), Dkt. Entry 13, at 13.) Scranton Petro, therefore, has the burden to articulate a legitimate, non-discriminatory reason for Ms. Faust's termination. In this regard, Scranton Petro submits that Ms. Faust's position was eliminated pursuant to the RIF

---

[9]Where, as here, a plaintiff is terminated as part of a RIF, the employee establishes a prima facie case of age discrimination by showing that (1) the employee was a member of the protected class, that is, age forty or over, see 29 U.S.C. § 631(a); (2) the employee was qualified for the position in question; (3) the employee suffered an adverse employment action; and (4) the employer "retained someone similarly situated to [the employee] who was sufficiently younger." Anderson, 297 F.3d at 249-50.

that was initiated to reduce company expenses.  Scranton Petro, therefore, has met its burden.

See, e.g., Klinman v. JDS Uniphase Corp., 439 F. Supp. 2d 401, 408 (E.D. Pa. 2006).

Because Scranton Petro has offered evidence of a legitimate, non-discriminatory reason

for Ms. Faust's termination, the burden returns to Ms. Faust.  In order to show Scranton Petro's

proffered non-discriminatory reason is a pretext, Ms. Faust must produce evidence "from which

a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons;

or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action."  Fuentes, 32 F.3d at 764.  Because she makes

arguments under both prongs, each will be separately discussed.

### 1) Fuentes – Prong One

The court in Fuentes stated:

> To discredit the employer's proffered reason . . ., the plaintiff cannot simply
> show that the employer's decision was wrong or mistaken, since the factual
> dispute at issue is whether discriminatory animus motivated the employer, not
> whether the employer is wise, shrewd, prudent, or competent.  Rather, the
> non-moving plaintiff must demonstrate such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the employer's proffered
> legitimate reasons for its action that a reasonable factfinder could rationally
> find them "unworthy of credence," and hence infer that the employer did not
> act for [the asserted] non-discriminatory reasons.

Id. at 765 (internal citations and quotation marks omitted).  In assessing Ms. Faust's evidence

on this prong, the Court is mindful that "'federal courts are not arbitral boards, ruling on the

strength of 'cause' for discharge.  The question is not whether the employer made the best, or

17

even a sound, business decision; it is whether the real reason is [discrimination].'" Keller, 130 F.3d at 1109 (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996) (per curiam)).

Ms. Faust argues that inconsistent testimony of the decision-makers, particularly the testimony of Mr. Diab, undermines the credibility of Scranton Petro's proffered justification. (Pl.'s Br. Resp. Mot. Summ. J. ("Pl.'s Br."), Dkt. Entry 16, at 11-12.)  For instance, Ms. Faust notes that Mr. Diab testified that he initiated the RIF to reduce company expenses.  He testified that he advised Mr. Krappa about the workforce reduction and instructed him to reduce payroll.  Mr. Krappa, who reports directly to Mr. Diab, denied he was ever told by Mr. Krappa of the RIF or the need to cut jobs.

Ms. Faust also observes that there is conflicting testimony as to who made the termination decision.  Mr. Diab testified that Messrs. Krappa and Hodges complained to him about Ms. Faust's performance.  Although he recommended she be terminated, he testified, and Scranton Petro does not dispute, that he relegated to Messrs. Krappa and Hodges the ultimate decision.  Mr. Hodges, however, denied suggesting that Ms. Faust be terminated or even having a voice in the decisionmaking process.  He testified that it was Mr. Diab who decided to terminate Ms. Faust, a decision communicated to him by Mr. Castor.  Mr. Krappa, for his part, testified that Mr. Diab was the decisionmaker.  And rather than urge Ms. Faust's termination, he attempted unsuccessfully to dissuade Mr. Diab during their conversation shortly

before her termination.

Additionally, Ms. Faust points to conflicting testimony as to why she was selected for termination.  According to Mr. Diab, Messrs. Krappa and Hodges were dissatisfied with her performance.  Mr. Krappa's account, if believed, contradicts Mr. Diab's explanation.  Mr. Krappa testified to a meeting with Messrs. Diab and Hodges seven to ten days before Ms. Faust's termination.  Neither Mr. Krappa nor Mr. Hodges complained to Mr. Diab about Ms. Faust's performance.  Instead, Mr. Diab inquired about Ms. Faust and pressed Mr. Hodges to push her to work harder.  As set forth above, Mr. Hodges answered that Ms. Faust would be incapable of meeting those demands due to her age and health.  Signaling she was "out," Mr. Diab directed Mr. Hodges to get rid of her.

Viewing this evidence in the light most favorable to Ms. Faust, the Court concludes there is a genuine issue of fact whether Scranton Petro's proffered justification was pretextual.  The inconsistent testimony cited by Ms. Faust implicates the credibility of Scranton Petro's proffered justification.  In this regard, our Court of Appeals has found that "factors such as the defendant's credibility . . . could raise an inference of pretext which would make summary judgment for the employer inappropriate."  Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638-39 (3d Cir. 1993); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 75 (1986) (Marshall, J., concurring in judgment) ("An employer can act only through individual supervisors and employees . . . .").

Should the jury believe Mr. Diab's testimony, it could reasonably conclude that Scranton Petro had initiated a workforce reduction pursuant to which Ms. Faust's position was eliminated. On the other hand, if the jury credits Mr. Krappa's testimony (1) that he was never told about the RIF and (2) that Mr. Diab ordered Ms. Faust's termination after hearing her age and health would limit her capabilities, it could rightfully reject Mr. Diab's testimony about the RIF and, in turn, reject as a pretext Scranton Petro's legitimate, nondiscriminatory reason. See Reeves, 530 U.S. at 137 (factfinder's rejection of the proffered justification, along with the prima facie showing of unlawful discrimination, will permit the factfinder to infer discrimination).  Because Mr. Krappa was directly underneath Mr. Diab in the management structure and often spoke to Mr. Diab about the complex operations, a jury could find it implausible that Mr. Krappa was ignorant of the RIF.

Moreover, there is conflicting testimony as to who actually ordered Ms. Faust's termination and the reasons therefor.  Depending on which testimony is credited by the jury, the jury could accept or reject Scranton Petro's proffered justification.

In short, Ms. Faust has presented sufficient evidence to enable a factfinder to conclude that Scranton Petro's proffered non-discriminatory reason is "unworthy of credence." Consequently, she survives summary judgment on this basis.

### 2) Fuentes – Prong Two

Under the second prong of Fuentes, Ms. Faust can defeat summary judgment by

presenting evidence from a which a jury might reasonably "believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action." Fuentes, 32 F.3d at 764. "In other words, . . . [Ms. Faust] must point to

evidence that proves age discrimination in the same way that critical facts are generally proved

– based solely on the natural probative force of the evidence." Keller, 130 F.3d at 1111.

Ms. Faust argues that age-related comments by Messrs. Hodges and Diab reveal the

true reason for her termination.  (Pl.'s Br. 7-8, 10.)  The decision-maker's age-related

comments can be probative of his discriminatory attitude towards older employees.  See

Reeves, 530 U.S. at 151-53; Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214-15 (3d Cir. 1995).

"'Age-related comments referring directly to the worker may support an inference of age

discrimination.'"  Barnes v. Foot Locker Retail, Inc., 476 F. Supp. 2d 1210, 1215 (D. Kan. 2007)

(quoting Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1025 (6th Cir. 1993)).  Nevertheless, "[s]tray

remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are

rarely given great weight, particularly if they were made temporally remote from the date of

decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992).

Ms. Faust has presented evidence of comments that are sufficient to support an

inference that discrimination was the real reason behind her termination.  The exchange

between Messrs. Hodges and Diab seven to ten days before Ms. Faust's termination is

probative of discriminatory animus.  When urged by Mr. Diab to press Ms. Faust to work

harder, Mr. Hodges stated that she would be unable to do so because of her age and health. Mr. Diab gestured that she was "out" and directed Mr. Hodges to get rid of her.  Seven to ten days later, Ms. Faust was terminated.  This exchange suffices to cast doubt on Scranton Petro's proffered justification and permit a jury to reasonably infer age was the motivating factor in Ms. Faust's termination.  See Armbruster, 32 F.3d at 783.

Additionally, Ms. Faust has presented evidence of other age-related comments.  For instance, Mr. Schoen overheard Mr. Hodges say that Ms. Faust "was unable to get around as well as younger people or that she was not able to get around as well because of her age."  Mr. Schoen was unsure when he heard this, but he stated in his affidavit that the comment was made between December, 2003, and April 8, 2004.  Mr. Krappa testified that during "certain conversations that I had with [Mr. Diab] . . . [Ms. Faust's] age was an issue. [Her age was] brought up by [Mr. Diab]."  (Krappa Dep. 41:2-8.)  He was unable, however, to provide further details of these conversations, such as when they occurred or the contents thereof.

Generally, these remarks would have limited probative value because they were unrelated to the decision to terminate Ms. Faust.  Nevertheless, in light of the exchange between Messrs. Hodges and Diab shortly before Ms. Faust's termination, the fact that the remarks were made by two potential decision-makers, and the fact that the remarks refer to Ms. Faust, support an inference of an age-based bias against Ms. Faust.

In summary, Ms. Faust has presented sufficient evidence with respect to the second

prong of Fuentes to enable a reasonable fact-finder to conclude that discrimination was more likely than not the reason for her termination. Scranton Petro denies such comments, but it will be for a jury to resolve this question of fact.[10]

### C. Sex Discrimination Claims

Ms. Faust also alleged she was terminated because of her sex in violation of Title VII and the ADEA. Title VII makes its unlawful "to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The PHRA contains an analogous proscription. See 43 Pa. Stat. Ann. § 955(a). The same standards that govern ADEA claims apply to Title VII and PHRA claims, see Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999), and thus a plaintiff can proceed under either the mixed-motive theory or pretext theory.

Because Ms. Faust has no direct evidence of sex discrimination, her claim will be analyzed under the McDonnell Douglas framework. Scranton Petro concedes that Ms. Faust has established a prima facie case of sex discrimination,[11] (Def.'s Br. Supp. 6), and this Court

---

[10] Because the evidence is sufficient to defeat summary judgment on the pretext theory of liability, there is no need to address the mixed-motives theory at this time.

[11] To establish a prima facie case of sex discrimination in the RIF context, the plaintiff must show that (1) she was a member of the protected class; (2) she was qualified for the position; (3) she suffered an adverse employment decision; and (4) persons outside the protected class were retained. Fletcher v. Lucent Techs., Inc., No. Civ. A. 02-3941(JAG), 2005 WL 2373191, at *5 (D.N.J. Sept. 27, 2005) (citing Rhett v. Carnegie Ctr. Assocs. (In re Carnegie Ctr. Assocs.), 129 F.3d 290, 294-95 (3d Cir. 1997)).

has already found the RIF constitutes a legitimate, non-discriminatory reason for Ms. Faust's termination.  Therefore, Ms. Faust must present evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

Here, Ms. Faust acknowledges that she has no evidence under the second prong of Fuentes to show that discrimination was more likely than not a cause for the employer's action. She argues, however, that evidence adduced in support of her ADEA claim to discredit Scranton Petro's proffered justification should be considered in her Title VII claim as well.  (Pl.'s Br. 15.)  The Court agrees.  See Stanziale, 200 F.3d at 105-07 (assessing evidence of pretext simultaneously for the ADEA and Title VII claims).

In analyzing Ms. Faust's ADEA claim, the Court determined there was sufficient evidence from which a jury could find Scranton Petro's proffered non-discriminatory reason "unworthy of credence."  A similar conclusion is warranted here.  Consequently, Scranton Petro's summary judgment motion with respect to the sex discrimination claims will be denied.

III. <u>CONCLUSION</u>

For the reasons stated, Scranton Petro's motion for summary judgment will be denied.

An appropriate Order follows.


s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARY ANN FAUST,                                :
                Plaintiff           :
    v.                                      :       3:CV-06-0672
                         :       (JUDGE VANASKIE)
SCRANTON PETRO, L.P.,                           :
              Defendant          :

ORDER

NOW, THIS 31st DAY OF MARCH, 2008, for the reasons set forth in the foregoing

Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment (Dkt. Entry 12) is DENIED.

2. A telephonic scheduling conference will be conducted on Friday, April 25, 2008, at

2:00 p.m.  Attorney Kimberly D. Borland, Esquire, is responsible for placing the call to 570-207-

5720, and all parties shall be ready to proceed before the undersigned is contacted.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge